# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-50381

United States Court of Appeals
Fifth Circuit

**FILED**

May 4, 2016

Lyle W. Cayce
Clerk

In the Matter Of:

VALENCE TECHNOLOGY, INCORPORATED,

      Debtor.

VALENCE TECHNOLOGY, INCORPORATED,

      Appellant,

v.

KPMG CORPORATE FINANCE, L.L.C.,

      Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Consolidated with Case No. 15-50384

In the Matter Of:

VALENCE TECHNOLOGY, INCORPORATED,

      Debtor.

VALENCE TECHNOLOGY, INCORPORATED,

      Appellant,

v.

ROTH CAPITAL PARTNERS, L.L.C.,

      Appellee.

No. 15-50381 cons/w No. 15-50384

---

Appeals from the United States District Court
for the Western District of Texas
USDC Nos. 1:14-CV-595, 1:14-CV-596

---

Before PRADO, OWEN, and HAYNES, Circuit Judges.

PER CURIAM:*

While in bankruptcy, Debtor–Appellant Valence Technology, Inc. ("Valence") sought to retain Appellees KPMG Corporate Finance, LLC ("KPMG") and Roth Capital Partners, LLC ("Roth") to arrange for a potential private placement of Valence's equity. The bankruptcy court subsequently approved Valence's employment of KPMG and Roth pursuant to Valence's engagement agreement with each Appellee. *See* 11 U.S.C. §§ 327(a), 328(a).

Section 3 of the engagement agreements detailed the parties' fee arrangement. Under this section, Valence "agree[d] to pay," an "Engagement Fee," a "Retainer Fee," and:

> [a]n additional fee (the "Success Fee") in an amount equal to 2.5% of the Private Placement Value (as defined below) less the amount of the previously paid Engagement Fee and Retainer Fee, but in no event less than a minimum success fee of $500,000 (the "Minimum Success Fee").

The following sentence defines "Private Placement Value" to mean:

> the aggregate amount of cash and the fair market value (on the date of closing) of any other consideration received by the Company in any Private Placement, excluding any consideration received by the Company's creditors in satisfaction of claims or debts existing on the date hereof.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

The next two sentences provide further conditions relating to the Success Fee:

> Any consideration received from Berg & Berg, Carl Berg or any other entity affiliated with Carl Berg, Johnson Controls, SAIF, Enertech Capital, Via Motors or any of their respective affiliates (collectively, the "Identified Parties") will be subject to a Success Fee of 1.25% (and not 2.5%), but still subject to the Minimum Success Fee.

> The Success Fee shall be payable with respect to the Private Placement upon consummation of such Private Placement.

The sole issue on appeal is the amount of the additional fee, i.e., the Success Fee, Valence owes based on one of the Identified Parties, Berg & Berg, agreeing to convert $50 million of its prepetition debt to equity in a reorganized Valence.[1] The bankruptcy court awarded KPMG and Roth each $595,000, which amounted to 1.25% of the $50 million debt-to-equity conversion less the $30,000 engagement and retainer fees that Valence had already paid. The district court affirmed the fee awards, and Valence appealed.

"We review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*, using the same standards that the bankruptcy court and district court applied." *Hurt v. Fed. Nat'l Mortg. Ass'n & Home Securitization Tr. 1 (In re Homeowners Mortg. & Equity, Inc.)*, 354 F.3d 372, 375 (5th Cir. 2003). The bankruptcy court held that the engagement agreements were unambiguous, which is a question of law that we review de novo. *See McDermott, Inc. v. Clyde Iron*, 979 F.2d 1068, 1072 (5th Cir. 1992), *rev'd in part on other grounds sub nom. McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994).

In its ruling, the bankruptcy court explained that Section 3 initially "defines [P]rivate [P]lacement [V]alue generally" to exclude "any consideration

---

[1] The parties do not dispute that Berg & Berg's debt-to-equity conversion qualified as a Private Placement under the engagement agreements.

No. 15-50381 cons/w No. 15-50384

received by [Valence's] creditors in satisfaction of [existing] debts." However, the next sentence "specifically carve[s] out Berg & Berg[, a creditor,] as one of the number of parties to be treated differently." The court held that this latter sentence—which is the "more specific sentence" vis-à-vis the preceding definition of Private Placement Value—"applies to Berg & Berg's exchange of debt for equity because it specifically carves out and addresses any consideration received from Berg & Berg." It also stated that this reading aligns with the engagement agreements' "overall purpose for employing [KPMG and Roth] to procure equity or equity-linked financing." It concluded that the agreements entitled KPMG and Roth to a Success Fee of 1.25% of "that $50 million exchange under the terms of the engagement [agreements] that specifically addressed consideration received from Berg & Berg."

We agree with the bankruptcy court's reasoning, which comports with the interpretive principle that a later, specific sentence in a contract controls over an earlier, general sentence. *See John Hancock Mut. Life Ins. v. Carolina Power & Light Co.,* 717 F.2d 664, 669 n.8 (2d Cir. 1982) (applying New York law). KPMG and Roth are each entitled to the fee of $595,000—that is, 1.25% of the $50 million value of Berg & Berg's debt-to-equity conversion minus the previously paid fees totaling $30,000.

AFFIRMED.

4

No. 15-50381 cons/w No. 15-50384

PRISCILLA R. OWEN, Circuit Judge, dissenting:

I respectfully dissent. KPMG and Roth were retained by the bankrupt entity in this case, Valence, to attempt to secure an infusion of new capital. KPMG and Roth made that attempt, but they were unsuccessful. No infusion of new capital occurred. Instead, an existing creditor exchanged $50,000,000 of secured debt for equity in the bankrupt entity. For their unsuccessful efforts to infuse new dollars, KPMG and Roth were paid the flat fee set forth in their contracts. But they claim they are additionally entitled to a "Success Fee" under the contracts. The contracts governing the engagement of Roth and KPMG are unambiguous. The "Success Fee" is based on a percentage of "the Private Placement Value" as defined in the contract. The definition of "Private Placement Value" expressly excludes the exchange of existing debt for equity that occurred. The majority opinion fails to give effect to the express terms of the agreements and instead of concluding that no "Success Fee" was owed, holds that $1,190,000 in fees are owed.

**I**

After filing for relief under Chapter 11 of the Bankruptcy Code, Valence Technology, Inc. (Valence) retained KPMG Corporate Finance, LLC (KPMG) and Roth Capital Partners, LLC (Roth) in an effort to secure investors to acquire the entire company or to purchase stock from the company in exchange for a capital infusion. The parties agreed in respective Engagement Letters that Roth and KPMG were not being hired to provide "restructuring or bankruptcy advice."

The relevant portion of the Engagement Letter that delineates Roth and KPMG's compensation is as follows:

5

No. 15-50381 cons/w No. 15-50384

## 2. Private Placement

For purposes of this Agreement, a "Private Placement" shall mean the sale of Securities in exchange for cash or other consideration not including a public offer. . . .

## 3. Private Placement Fees and Expenses

As compensation for the services to be provided by [KPMG and Roth] hereunder, [Valence] agrees to pay to [KPMG and Roth]:

> a) a nonrefundable engagement fee (the "Engagement Fee") of $15,000, payable promptly upon approval by the Bankruptcy Court;

> b) an initial retainer fee (the "Retainer Fee") of $15,000, payable in advance one month after the execution of this Agreement; and

> c) an additional fee (the "Success Fee") in an amount equal to 2.5% of the Private Placement Value (as defined below) less the amount of the previously paid Engagement Fee and Retainer Fee, but in no event less than a minimum success fee of $500,000 (the "Minimum Success Fee").

For purposes of this Agreement, "Private Placement Value" shall mean the aggregate amount of cash and the fair market value (on the date of closing) of any other consideration received by the Company in any Private Placement, excluding any consideration received by the Company's creditors in satisfaction of claims or debts existing on the date hereof. Any consideration received from Berg & Berg, Carl Berg or any other entity affiliated with Carl Berg, Johnson Controls, SAIF, Enertech Capital, Via Motors or any of their respective affiliates (collectively, the "Identified Parties") will be subject to a Success Fee of 1.25% (and not 2.5%), but still subject to the Minimum Success Fee.

Roth and KPMG together contacted "over one hundred entities" in their search for financing, and although they were unable to secure any offers for a

No. 15-50381 cons/w No. 15-50384

capital contribution in exchange for newly issued equity, they did locate two investors who proposed to acquire Valence's entire business. Valence's board declined these offers and instead opted for a plan of reorganization, pursuant to which its largest secured lender, Berg & Berg, agreed to contribute an additional $20 million of new debt financing to Valence; extend the maturity date of $19.1 million of the approximately $69.1 million in pre-petition secured debt owed to it; and forgive the remaining $50 million of secured debt in exchange for 100% of the new equity in the reorganized company.

After the reorganization was complete, Roth and KPMG applied to the bankruptcy court for a Success Fee pursuant to the terms of the Engagement Letter. The court awarded each 1.25% of the value of Berg & Berg's exchange, offset by the $30,000 of engagement and retainer fees already paid, for a total award to each party of $595,000. The district court affirmed the awards, which Valence appeals.

## II

New York law, which governs the construction of the Engagement Letter, directs that "[a] written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties."[1] "Ambiguity is determined within the four corners of the document," but "[t]o determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole."[2] "[E]xtrinsic evidence 'may be considered only if the agreement is ambiguous.'"[3]

---

[1] *Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (2011).

[2] *Id.* at 185-86.

[3] *Id.* at 186 (quoting *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008)).

No. 15-50381 cons/w No. 15-50384

The parties dispute whether the fact that the Engagement Letter states that "[a]ny consideration received from Berg & Berg . . . will be subject to a Success Fee of 1.25%" means that Roth and KPMG are owed a Success Fee even though they did not secure an injection of capital outside of restructuring. The district court concluded that Berg & Berg's debt-for-equity swap "qualified as a Private Placement with Private Placement Value," and therefore that Roth and KPMG are each "entitled to a Success Fee of 1.25% of the $50 million conversion of secured debt."

But this conclusion, which the majority opinion adopts, ignores the unambiguous requirements of the Engagement Letter. Even assuming, *arguendo*, that the transaction with Berg & Berg qualifies as a "Private Placement," because it entailed the "sale of Securities"—100% of new Valence stock—"in exchange for cash or other consideration"—cancellation of $50 million of secured debt—any "Success Fee" must still be calculated as a percentage of "Private Placement Value." The latter term is defined as "the aggregate amount of cash and the fair market value . . . of any other consideration received by the Company in any Private Placement, excluding any consideration received by the Company's creditors in satisfaction of claims or debts existing on the date hereof." Here, the aggregate amount of consideration received by Valence—the $50 million of debt cancellation—is entirely offset by the shares received by Berg & Berg as compensation in satisfaction of the forgiven debt. The Private Placement Value of the Private Placement completed with Berg & Berg thus was zero. As the district court correctly stated in its analysis, "for KPMG [and Roth] to qualify for the [1.25%] Success Fee . . . there must have been a private placement, with private placement value, as those terms were defined in the Agreement." Because there was no Private Placement Value here, no Success Fee is owed.

8

KPMG and the majority opinion disagree, relying on the sentence that provides: "Any consideration received from Berg & Berg . . . will be subject to a Success Fee of 1.25% (and not 2.5%), but still subject to the Minimum Success Fee."  The majority opinion concludes that the term "Success Fee" as used in this sentence does not draw its meaning from the definition set forth in the preceding paragraph, but instead stands alone as an entirely separate concept. This is implausible and an unreasonable construction of the agreements. "Success Fee" is a defined term that retains its definition throughout the contract, and any Success Fee owed to KPMG as a consequence of consideration received from Berg & Berg must be defined as a percentage of Private Placement Value, less the Engagement and Retainer Fees.  Because the Private Placement Value of the transaction with Berg & Berg is zero, the applicable Success Fee is also zero.

Roth argues, and the majority opinion agrees, that the final paragraph quoted above "contemplate[s] two 'exit strategies' for Valence," one of which is that a "Success Fee" would be owed if Valence received consideration in any form from any of the identified Berg entities.  But that interpretation reads words into the paragraph, and more importantly, reads the immediately preceding sentence entirely out of the definition of "Success Fee" as applied to the Berg entities.  The sentence establishing a 1.25% Success Fee for a transaction with any of the "Identified Parties" is naturally read merely to adjust the size of any Success Fee in the event of a qualifying transaction with a known, identified Berg entity, as opposed to a new third party; it would be anomalous to ignore the fact that the sentence uses a capitalized term that was defined in the same section of the agreement without providing a new definition or in any way indicating that the extant definition does not apply. The sentence unambiguously refers to the already-provided definition of

9

"Success Fee" and simply substitutes "1.25%" for "2.5%" in that definition. Moreover, the fact that any consideration received from an Identified Party is "subject to" the 1.25% Success Fee is consistent with a requirement that the general definition of the term be applied to the amount of consideration in question.

## III

Because the relevant contractual terms are unambiguous, we need not consider extrinsic evidence in construing those terms. However, to the extent that there is ambiguity, the context and the available evidence do not render the natural reading unreasonable or improbable.

KPMG makes much of the fact that Valence conceded in the disclosure statement submitted with its plan of reorganization that the contribution it sought to secure with Roth and KPMG's assistance was "exit financing," and any such financing would not likely have redounded to the benefit of Valence's existing shareholders. But that does not change the fact that Valence pursued such financing in part to fund "anticipated requirements for working capital and for capital expenditures until [Valence] could achieve profitability." Thus, more so than a debt restructuring standing alone, an infusion of additional financing was intended to maintain Valence as a viable going concern by providing the company with additional working capital. KPMG's argument that Valence's interpretation of the Letter of Engagement to allow for this possibility is "absurd" is backward: if KPMG is correct that "the purpose[] of the entire bankruptcy was to allow [Berg & Berg] to leverage its existing position and become the sole shareholder," irrespective of the need to secure any additional capital, then the company would not have agreed to pay Roth and KPMG over a million dollars to bring about that inevitable result. If anything, KPMG's argument on this point provides a rationale for a contract

10

that would award *no* Success Fee pursuant to a debt restructuring, because in such a case Roth and KPMG would have provided little of value.

Roth objects that Valence's interpretation of the Engagement Letter would require that the Letter contemplate the possibility that the Identified Parties might accept new shares in the company in exchange for cash or other consideration, rather than in exchange for a cancellation of indebtedness. This is a sensible inference, because the sentence that establishes an alternate 1.25% Success Fee would be superfluous if the only feasible transaction between Valence and the Identified Parties were one with a Private Placement Value of zero. However, Roth further argues that "[i]t is nonsensical to think that a creditor would provide tens of millions of dollars in new cash or new equivalents and leave its prior debts outstanding." But the Private Placement Value formula accounts for this contingency by excluding only the amount of consideration received by existing creditors "in satisfaction of claims or debts." Therefore, in the event of a debt restructuring coupled with an equity injection from an existing creditor, the total value of consideration received by Valence (i.e. the amount of the debt forgiven in the restructuring plus the value of the equity injection) would only be reduced by the amount of forgiven debt. Roth and KPMG would be owed a percentage of the value of the new money contributed to the company. There is nothing outlandish about the proposition that the contract explicitly provides for the possibility that existing creditors would make an equity investment. But Berg & Berg did not make an equity investment. It only forgave existing debt in exchange for equity.

\* \* \*

For the foregoing reasons, I would reverse the district court and award no Success Fee to Roth or KPMG.

11