582

Alejandro HERNANDEZ,
Plaintiff–Appellee,

v.

M/V RAJAAN, Etc., and Dianella Shipping Corporation, Defendants-Third Party Plaintiff-Appellants,

v.

ISHIKAWAJIMA HARIMA HEAVY INDUSTRIES, LTD., Cargill, Inc., et al., Third Party Defendants-Appellees.

Alejandro HERNANDEZ,
Plaintiff-Appellee,

v.

M/V RAJAAN, Her Engines, Tackle, etc., in rem, and Dianella Shipping Corporation, Defendants-Appellants.

Nos. 85–2608, 87–2044.

United States Court of Appeals,
Fifth Circuit.

March 30, 1988.

Edward J. Hennessy, Helm, Pletcher, Hogan, Bowan & Saunders, Earl B. Austin, Baker & Botts, Houston, Tex., for Cargill, Inc.

David G. Matthiesen, Funderburk & Funderburk, Houston, Tex., for Langston Companies, Inc.

Stephen W. Hanks, Timothy H. Pletcher, Houston, Tex., for Hernandez.

Louis E. McCarter, Richard L. Lagarde, Houston, Tex., for Ishikawajima Harima Heavy Industries, Ltd.

Butler & Binion, Walker Beavers, Robert D. Arredondo, Houston, Tex., for Brazos River Harbor Navigation Dist.

Gray H. Miller, Fulbright & Jaworski, Houston, Tex., for Texas Employers' Ins. Ass'n.

John P. Forney, Jr., Houston, Tex., for Ohji Seiki-Kogyo Kabushiki.

Robert L. Adams, Houston, Tex., for Synthetic Industries, Inc.

Robert MacIntyre, Jr., Houston, Tex., for Euro Grain Trading, Ltd.

Edward J. Hennessy, Randall D. Wilkins, Houston, Tex., for Affiliated Rice Mills.

Before CLARK, Chief Judge,
BRIGHT* and POLITZ, Circuit Judges.

CLARK, Chief Judge:

The district court held a vessel owner liable to a longshoreman injured while loading palletized bags of rice into the vessel's cargo hold. We affirm that court's judgment of liability and portions of the damages awarded. We also affirm the rejection of the vessel owner's limitation of liability defense. We vacate, reverse or modify certain portions of the damages award we find to be erroneous.

On September 21, 1983, Alejandro Hernandez was partially paralyzed while working as a longshoreman aboard the M/V RAJAAN, a vessel owned by the Dianella Shipping Corp. The RAJAAN had docked in Freeport, Texas en route to Jordan to take on a cargo of rice. Hernandez, a thirty-two year old Mexican citizen, was helping to unload pallets of rice in the cargo hold of the RAJAAN. One of the hydraulic winches used to lower the pallets of rice malfunctioned and a 110–pound sack of rice fell onto Hernandez. As a result, he was permanently paralyzed from the chest down and retained only limited use of his arms.

Hernandez filed suit against Dianella, in personam, and against the M/V RAJAAN in rem. Dianella and the RAJAAN impleaded several third-party defendants.[1]

Hernandez settled with the third-party defendants for $410,000.00 before trial with the agreement that the settling defendants would be reimbursed if Hernandez's recovery exceeded $3,000,000.00. The Texas Employer's Insurance Association intervened and recovered $159,585.91 in compensation and medical benefits paid to Hernandez.

The district court sitting without a jury found Dianella and the M/V RAJAAN liable under 33 U.S.C. § 905(b) (1986). It awarded Hernandez pecuniary and non-pecuniary damages in the following amounts:

| | |
|---|---|
| Lost future wages | $ 800,221.00 |
| Lost household services | $ 87,000.00 |
| Past medical expenses | $ 153,472.48 |
| Future medical expenses | $ 582,000.00 |
| Attendant care | $ 730,000.00 |
| Future medical supplies | $ 152,000.00 |
| Transportation and non-medical commodities | $ 465,000.00 |
| Pain and suffering | $1,000,000.00 |
| $3,969,693.48 | |

The court found Hernandez 5% negligent and reduced the recovery to $3,771,208.80. The court held a separate proceeding after trial on Dianella's petition to limit liability to the value of the vessel and pending freight under 46 U.S.C. § 183(a) (1975). The court rejected the petition on grounds that Dianella had not met its burden of proving that it lacked privity or knowledge of the negligent conditions which caused Hernandez's injuries.

Dianella appeals the finding of negligence and disputes the calculation of damages. We affirm the district court's findings on liability however find several portions of the damage award to be in error.

A) *Liability*

The legal duty of a shipowner to an injured worker arises from 33 U.S.C. § 905(b) (1986). It provides:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third

---

* Circuit Judge of the Eighth Circuit, sitting by designation.

1. These defendants were Ishikawajima-Harima Heavy Industries, Ltd. (the manufacturer of the winch); O.J.I. Seiki-Kogyo Kabshiki Kaisha (the manufacturer of the winch's remote control system); Affiliated Rice Mills (a successor in interest to the company which milled and bagged the rice); Langston Companies, Inc., Continental Bag Division (the manufacturer of the polypropylene bags which held the rice); Cargill, Inc. (which purchased the rice for resale to the government of Iraq); Euro Grain Trading, Ltd. (which bought the rice from Cargill and chartered the RAJAAN); and Brazos River Harbor Navigation District (which provided the RAJAAN with berthing, water and other necessities). The court dismissed for failure to state a claim other third-party defendants impleaded by Dianella.

party in accordance with the provisions of section 933 of this title ..."

 The Supreme Court clarified the duties imposed on shipowners and stevedores by § 905(b) in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The Court held that under § 905(b):

"a shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore."

*Scindia*, 101 S.Ct. at 1624. The shipowner is entitled to rely on the stevedore and in general owes no duty to a longshoreman injured in the course of cargo operations. *Morris v. Compagnie Maritime des Chargeurs Reunis, S.A.*, 832 F.2d 67, 71 (5th Cir.1987). However, *Scindia* provides that if the shipowner had actual knowledge of a condition which presented an unreasonable danger to a longshoreman and actual knowledge that he could not rely on the stevedore to correct the condition, then the shipowner, not the stevedore, is liable to the longshoreman. *Scindia*, 101 S.Ct. at 1626. In *Helaire v. Mobil Oil Co.*, 709 F.2d 1031 (5th Cir.1983) this Circuit held that:

"[o]nce loading operations have begun, the vessel owner can be held liable for injuries to employees of the stevedore resulting from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation."

*Helaire*, 709 F.2d at 1038–39. If the condition existed from the outset, the shipowner is charged with actual knowledge of the dangerous condition and has a duty to warn the stevedore and the longshoremen if the defect is hidden. *Harris v. Flota Mercante Grancolombiana, S.A.*, 730 F.2d 296, 299 (5th Cir.1984).

 The district court charged Dianella with actual knowledge of an unreasonably dangerous condition based on its finding that the winch had been malfunctioning since the outset of loading. The court relied on testimony that entries in the ship's log several days before the accident indicated that there was a "leaky winch" in the number one masthouse. No entry on the log indicates that a permanent repair was made. The vessel's second engineer testified that two days prior to the accident, the crew had pumped hydraulic fluid into the winch to purge air from the hydraulic system. The air pressure indicated that the system was leaking.

Next the court held that Dianella had actual knowledge that it could not rely on the stevedore to fix the winch. The stevedore testified that from the outset of loading, the winch would slow down or stop unexpectedly causing pallets holding sacks of rice to swing precariously above the cargo hold. On the day of the accident, each time the winch malfunctioned the stevedore notified the ship's crew. The crew halted loading and added hydraulic fluid to the winch. The stevedore would then resume loading. From this the district court concluded that Dianella had actual knowledge that the stevedore would continue to use the winch in its hazardous condition without remedying it and that the ship had a duty to intervene and repair the winch or take it out of service.

We uphold the district court's finding that Dianella was liable under § 905(b). Dianella argues that the stevedore is liable because he did not stop loading and inform Dianella when the winch malfunctioned immediately before Hernandez's accident. However, the record is replete with evidence that the winch had malfunctioned on many occasions prior to the day of injury, had malfunctioned several times on the day of the accident and that the additions of hydraulic fluid by Dianella were clearly not preventing or correcting the malfunctions. From this the district court fairly charged Dianella with actual knowledge of the malfunctioning winch and with knowledge that the stevedore, who had been relying on Dianella to repair the winch, could not be expected to remedy the danger.

## B) *Damages*

Dianella contends that several components of the damage award are excessive.

The standards under which we review a damage award for excessiveness are well known. A trial judge's assessment of damages is a finding of fact which we review under the clearly erroneous standard. *Sosa v. M/V LAGO IZABAL*, 736 F.2d 1028, 1035 (5th Cir.1984), (*citing, Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 783 (5th Cir.1983)). This court will not overturn a damage award unless the trier of fact abused its discretion. *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 331 (5th Cir.1987) (*citing, Hawkes v. Ayers*, 537 F.2d 836, 837 (5th Cir.1976)). A verdict will be considered excessive only if it is greater than the maximum amount the trier of fact could properly have awarded. *Sosa, supra*, at 1035. An appellate court may not determine excessiveness by comparing verdicts in similar cases, but rather must review each case on its own facts. *Winbourne v. Eastern Airlines, Inc.*, 758 F.2d 1016, 1018, (5th Cir.1984), *cert. denied*, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed. 2d 582 (1985); *Sosa, supra*, at 1035.

Having determined that an award is excessive, this court may either order a new trial on damages or may give the plaintiff the option of avoiding a new trial by agreeing to a remittitur of the excessive portion of the award. *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 919 (5th Cir.1987) (*citing, De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142 (5th Cir.1986)); *Wells v. Dallas Independent School District*, 793 F.2d 679, 683–84 (5th Cir.1986). This Circuit follows the maximum recovery rule under which a remittitur may reduce damages only to the maximum amount a trier of fact could properly have awarded. *Osburn, supra*, at 919 (*citing, Zeno v. Great Atlantic & Pacific Tea Co.*, 803 F.2d 178, 181 (5th Cir.1986)); *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983). Under these criteria, we review each component of the damage award.

### i) *Lost Wages*

The trial court calculated the present value of Hernandez's lost future wages using the below-market discount rate. In arriving at the sum of $800,221.00, the court relied exclusively on the calculations of Hernandez's expert. The expert assumed a work-life expectancy of 30 years and used the average full-time United States longshoreman's rate of $23,000.00 per annum. The court adjusted this figure upward to account for seniority and added an additional 15% for fringe benefits. The court adjusted the figures downward to account for inflation, subtracted federal income taxes and multiplied by .85 to arrive at the present value of lost future wages.[2]

The record does not support these findings. Hernandez's tax returns show that he had been a part-time longshoreman for the three years preceding his injury. His wage rate was $14.00 per hour. In 1980 he earned $8,341.00, in 1981 he earned $8,634.00, in 1982 he earned $6,500.00 and in 1983 (prior to the accident) he earned $2,600. No evidence supports the court's conclusion that Hernandez, a part-time worker, would have gained any seniority had he been able to remain on the job. There is no evidence that Hernandez had ever received any fringe benefits.

In *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983) (en banc), *cert. denied sub. nom., Heinrich Schmidt Reederei v. Byrd*, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984) (*Culver II*) the Circuit en banc stated that:

> "calculation of the lost income stream begins with the gross earnings of the injured party at the time of the injury. To this amount other income incidental to work, such as fringe benefits, should be added. From it, the fact-finder should subtract amounts the wage earner would have been required to pay such as income tax and work expenses."

*Culver II*, 722 F.2d at 117.

■ Based on *Culver II*, the trial court was clearly erroneous in accepting a damage calculation based on the average longshoreman's wage rate. *Culver II* requires

---

**2.** The trial court failed to subtract $56,000 for social security taxes. Hernandez concedes a

remittitur in this amount would be due.

the court to use the plaintiff's gross earnings at the time of the injury. The court further erred by adding fringe benefits and seniority in the absence of evidence that Hernandez was entitled to these benefits while he was working part time.

■ Dianella presented a computation using the below-market discount rate method but substituting Hernandez's actual earnings in the 3.82 years preceding the accident without seniority and fringe benefits. Under these calculations, Hernandez's lost wages would amount to $190,296.00.[3] Hernandez has not had the opportunity to challenge the accuracy of Dianella's calculations. We therefore hold that on the issue of lost wages Hernandez may either agree to a remittitur in the amount of $689,925.00, or he may opt for a new trial under the dictates of *Culver II* and this opinion.

### ii) *U.S. or Mexican Rates*

■ In calculating lost wages and medical expenses, the district court assumed that Hernandez could continue working as a United States longshoreman despite evidence that he was an illegal alien who had been deported on several previous occasions and whose wife and three children resided in Mexico. The court based its assumption on its finding that Hernandez intended to reside permanently in the United States.

The court's assumption that an illegal alien may collect lost wages and medical expenses based on United States rates is called into question by *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984). In *Sure-Tan*, the Supreme Court remanded an award of a six-months back pay to several illegal aliens stating that:

"in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States."

*Sure-Tan*, 104 S.Ct. at 2814. By similar logic, Dianella argues that Hernandez should be deemed ineligible to recover lost future United States wages and United States medical expenses because he was not entitled to be present and employed in the United States for the remainder of his life.

Although Dianella's argument may have been correct at the time of Hernandez's injury, the Immigration Reform and Control Act of 1986, 8 U.S.C. §§ 1101 *et seq.* (1987), has placed a belated stamp of legitimacy on the district court's assumption that Hernandez could remain in the United States. Section 1255a(a)(2)(A) of the Act provides that any alien who:

"establish[es] that he entered the United States before January 1, 1982, and that he has resided continuously in the United States in an unlawful status since such date ..."

and who meets the other requirements of the Act may be considered an alien lawfully admitted for temporary residence. The record indicates that Hernandez has resided in the United States continuously since 1970 and is therefore likely eligible for resident alien status. We need not ponder the effect of applying *Sure-Tan*'s "legal readmittance into the United States" language to the court's award of lost wages and medical expenses to Hernandez. An illegal alien who has demonstrated his eligibility for permanent resident status under the Immigration Reform and Control Act is entitled to a damage award based on United States wage and medical rates.

### iii) *Household Services*

■ The district court awarded $87,000.00 for lost household services. The court calculated that Hernandez would have performed 10 hours of household services a week for the remainder of his 72 year life expectancy. However, there was no evidence that Hernandez had performed any household services prior to his injury. Hernandez testified that he lived alone in

**3.** Because social security taxes have been subtracted from Dianella's calculation of lost wages, it is not necessary to deduct from this sum the amount of $56,000.00 which Hernandez conceded was in error.

an apartment at the time of his injury and performed no yard or automobile work. His wife and three children lived in Mexico and his services could not have contributed to their household.

It is indisputable that Hernandez, a paraplegic, has lost his ability to perform household services in the future. However, the trial court is not at liberty to grant damages for lost household services in the absence of *any* evidence that Hernandez performed household services in the past. *See e.g., De Centeno v. Gulf Fleet Crews, Inc.,* 798 F.2d 138, 142 (5th Cir.1986). In addition, because Hernandez received an award for attendant care, the additional recovery for lost household services would constitute a double recovery. The erroneous allowance of $87,000.00 for lost ability to perform household services is reversed.

### iv) *Medical Expenses*

The trial court awarded $153,472.48 in past medical expenses, $152,000.00 for future medical supplies and $582,000.00 in future medical and hospital expenses exclusive of attendant care. Hernandez's expert arrived at these figures by estimating what medical expenses Hernandez had incurred to date as a paraplegic and what expenses he could be expected to incur given his permanent disability.

Dianella challenges the expert's calculation of future medical and hospital expenses on the basis that he used tax exempt rather than taxable bonds. Dianella contends that the proper figure should have been $451,000.00. However, Dianella presents no legal authority suggesting that the expert's choice of tax exempt bonds was improper. Both types of investment were available and either properly could be used in the calculation. *See, e.g., Culver II, supra,* 722 F.2d at 122. This part of the award is supported by substantial evidence.

Dianella further contends that the court should have calculated medical expenses using Mexican rather than United States rates. Dianella cites *Sosa v. M/V LAGO IZABAL,* 736 F.2d 1028, 1034 (5th Cir.1984) in which we upheld the use of American medical rate in calculating medi-

cal expenses for a Mexican national only after a finding that "[the plaintiff] would not receive adequate medical care in Mexico." *Sosa,* 736 F.2d at 1034. Dianella contends that because the court made no such finding in Hernandez's case, it cannot calculate future medical expenses using American rates. However, *Sosa* does not state that a finding of inadequate foreign medical care must precede every award of medical expenses based on American rates. The decision of which rate to use is a finding of fact which varies from case to case. In this case, Hernandez has been under the care of doctors in Houston and, as discussed in § ii, *supra,* is probably entitled to remain in the United States for his medical care. The court's award of medical expenses based on American rates is therefore not clearly erroneous.

### v) *Transportation and Non-Medical Commodities:*

The court awarded $446,400.00 for transportation expense and $18,600.00 for non-medical commodities such as utility bills, cleaning and laundering. Substantial evidence supports the district court's finding that paraplegics do incur higher utility bills and laundering expenses than nonparaplegics. However, substantial evidence does not support the court's award for transportation expenses. Hernandez testified that he never owned a vehicle before the accident and that since the accident, he only leaves his house to visit friends at a local social hall. He makes this 20–block trip in his wheelchair for exercise. No evidence was presented that Hernandez needed a modified van for medical reasons. This testimony does not support the court's finding that Hernandez required the continuous use of a fully new van plus modifications and operating expenses totaling $446,400.00.

Dianella's expert testified that a large, two-door sedan provided customary transportation for paraplegics at a cost, including upkeep, of $24,248.00. In light of Hernandez's testimony concerning his infrequent use of transportation, this is the largest award supportable by the evidence.

Hernandez may accept a remittitur in the amount of $422,151.00 or choose a new trial on the issue of transportation expenses limited to meeting proven needs on a basis of using or renting vehicles of reasonable cost.

### vi) *Attendant Care*

■ The court found that Hernandez would incur $12,547.00 per year in attendant care expenses, at a present value of $730,000.00. The court based its conclusions on Hernandez's expert's testimony that Hernandez would require four hours of assistance by a nurse's aide daily. In the alternative, Hernandez's wife could be compensated on the basis of a nurse's aide's salary for her assistance in "bathing, housekeeping and meal preparation."

Dianella contends that at most Hernandez requires one or two hours of attendant care daily. In fact, Dianella states that Hernandez would have difficulty being available for four hours of care each day in light of his active rehabilitation schedule. Dianella further states that Hernandez's wife should be compensated on a minimum wage scale, not at the salary of a nurse's aide. Dianella assumes that Hernandez's wife will be available to provide attendant care and that her care will be comparable to that care provided by a nurse's aide. Under its calculations, the maximum amount recoverable for attendant care is $141,534.50.

The evidence supports the district court's rejection of Dianella's assumptions. Hernandez will require skilled attendant care for the rest of his life. The record does not establish that his wife will continue to provide it or will provide it as competently as a nurse's aide. The trial court's award for attendant care is affirmed.

### vii) *Pain and Suffering*

■ The trial court awarded $1,000,-000.00 for pain and suffering. Dianella disputes this finding on the basis that Hernandez was instantly paralyzed from the waist down and could not have felt any substantial pain as a result of the injury. Daniella contends that mental anguish does not justify the award in light of testimony by Hernandez's treating physician that he had adjusted well to the disability.

In *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir.1983), we stated that:

"any amount awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation."

*Hyde*, 697 F.2d at 632. Each award for pain and suffering depends heavily on its own facts. *Allen v. Seacoast Products*, 623 F.2d 355, 364 (5th Cir.1980).

The trial court based its award for pain and suffering on testimony that Hernandez suffered "phantom pains" in his legs, underwent several painful surgical procedures and would probably require more surgery in the future. He has experienced a catastrophic change in his lifestyle which has caused a significant degree of mental anguish. In light of this testimony, $1,000,000.00 is not a clearly excessive award beyond the "maximum possible recovery for these injuries." *Sosa, supra*, 736 F.2d at 1035. This award is affirmed.

### viii) *Pre and Post Judgment Interest:*

The district court awarded prejudgment interest on the full damage award at a rate of 9% per annum accruing from the date of the injury to the date of the judgment. The court awarded postjudgment interest at a rate of 8.18% per annum.

■ The award of prejudgment interest in admiralty cases is within the discretion of the trial court. *Curry v. Fluor Drilling Services, Inc.*, 715 F.2d 893, 896 (5th Cir. 1983) (*citing, Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 988 (5th Cir.1978)). In cases arising under 33 U.S.C. § 905(b), prejudgment interest is the rule, not the exception. *Webster v. M/V MOOLCHAND, Sethia Liners Ltd.*, 730 F.2d 1035, 1040 (5th Cir.1984) (*citing, Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1042 (5th Cir.1983)).

■ However, the trial court erred in awarding prejudgment interest with re-

spect to future damages. *Martin v. Walk, Haydel & Associates, Inc.*, 794 F.2d 209, 212 (5th Cir.1986); *Wyatt v. Penrod Drilling Co.*, 735 F.2d 951, 956 n. 4 (5th Cir. 1984). At oral argument Hernandez conceded that a remittitur of prejudgment interest on future damages was due. We affirm the award of prejudgment interest on past damages and the award of post-judgment interest, but direct the district court to recalculate the amount of interest awarded on future damages and vacate its prejudgment interest award.

### ix) *Credit for Settlement:*

The third-party defendants settled with Hernandez before trial for $410,000.00 and then participated in the trial to establish Dianella's negligence. Dianella concedes that under *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1251 (5th Cir.1979) it is not automatically entitled to a credit for the settlement. It argues, however, that the amount of the settlement must be deducted from the total damages awarded for Hernandez's injury. Dianella's arguments have merit.

In a recent decision, the Eleventh Circuit held that a plaintiff in a maritime suit is entitled to receive a full damage award less any amount he recovered in a settlement with third-party defendants. *Self v. Great Lakes Dredge & Dry Dock Company*, 832 F.2d 1540, 1548 (11th Cir.1987). We find the Eleventh Circuit's reasoning in *Self* sound. Hernandez is only entitled to one recovery for the injuries he suffered. *Strachan Shipping Co. v. Nash*, 782 F.2d 513, 520 (5th Cir.1986). Because the court's award against Dianella represented 100% of the loss Hernandez suffered (less 5% for contributory negligence) his award from Dianella must be reduced by any amount he received in a settlement from the third-party defendants.

### C) *Limitation of Liability*

At a separate hearing after the verdict was rendered, the district court denied Dia-

nella's petition to limit its liability to the value of the vessel plus pending freight, pursuant to 46 U.S.C. § 183(a) (1958).[4] Section 183(a) provides that:

"The liability of the owner of any vessel ... for any loss, damage, or injury ... done, occasioned or incurred, without the privity or knowledge of such owner or owners, shall not, except in cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

"Privity" as used in the statute means some fault or neglect in which the shipowner personally participates. "Knowledge" means personal cognizance or means of knowledge of which the shipowner is bound to avail himself. *Matter of Texaco, Inc.*, 570 F.Supp. 1272, 1278 (E.D. La.1983). The burden of establishing 'lack of privity or knowledge' is on the shipowner. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir.1976). The court denied the defense holding that Dianella did not meet its burden of establishing lack of privity or knowledge about the malfunctioning winch.

Dianella's managing agent and port engineer testified that they did not have privity or knowledge of negligent acts or unseaworthy conditions. However, this testimony does not establish that the RAJAAN's owner lacked privity or knowledge of the unseaworthy conditions nor does it establish who exercised control over the RAJAAN. In light of this failure of proof by Dianella and the fact that proof of privity or knowledge of the RAJAAN's owners was solely within Dianella's control, we affirm the findings of the district court.

The costs of this appeal will be equally divided between the parties.

AFFIRMED in part, subject to possible remittitur, and, in part, VACATED and REMANDED.

---

**4.** The value of the vessel plus pending freight was $2,820,917.39. We recognize that the adjustments in damages awarded could render this issue moot. However, since the case must go

back for further consideration by the district court, it is in the interest of justice to rule on the issue now in the event it recurs.