# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 18, 2010

Charles R. Fulbruge III
Clerk

No. 09-30443

DAVID R. MAYNE,

Plaintiff–Appellee,

v.

OMEGA PROTEIN INC.; COTE BLANCHE BAY M/V,

Defendants–Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:07-CV-4210

Before SMITH, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:[*]

Omega Protein, Inc. and its vessel, F/V COTE BLANCHE BAY (jointly, Omega Protein), appeal a district court judgment in favor of David Mayne. Omega Protein seeks reversal on numerous grounds related to the pleadings and the sufficiency of the evidence introduced at trial. We affirm in part, vacate in part, and remand.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-30443

**I**

Omega Protein employed Mayne as a fisherman on the F/V COTE BLANCHE BAY. The F/V COTE BLANCHE BAY specializes in harvesting menhaden, a small oil- and protein-rich fish used in a variety of products, including fish oil and meat. The process of fishing for menhaden involves three vessels. When a school of menhaden is located, the main vessel releases two smaller, forty-foot vessels, referred to as "purse boats." The purse boats deploy a net to encircle the school of fish. The net, which is approximately 1,200 feet long, is weighted down by eighty large metal rings. A long cable runs through the rings; it is used to close the bottom of the net after the purse boats wrap it around the school of fish. Once the net is in place, the purse boats come together in a "V" configuration alongside the main vessel. At this point, a winch located on the main vessel is used to lift the net out of the water. Crew members in the purse boats pile the net into the purse boats. They work with the winch operator to ensure that the lift goes smoothly and that the metal rings do not get caught, which could result in damage to the net.

On the day Mayne was injured, the F/V COTE BLANCHE BAY was fishing for menhaden off the coast of Louisiana. Mayne was stationed on one of the purse boats and securing the net as it was lifted out of the water. Captain Schools, an Omega Protein employee, activated the winch on the main vessel to bring in the net. Captain Schools had a full view of Mayne. At some point in the process of lifting the net, a ring became caught between a step and the thwart on Mayne's purse boat. The continued operation of the winch built up tension on the ring. When the ring broke free, it shot upward and hit Mayne in the face, causing multiple fractures to his face and skull. After initial emergency treatment, Mayne underwent surgery to remove bone fragments and repair some of the damage.

2

No. 09-30443

Thirteen days after the surgery, Mayne returned to his surgeon, Dr. Robin Barry, complaining of headaches and sensitivity to light. Two weeks later, Mayne went to see Dr. Fayez Shamieh, a neurologist, for treatment related to dizziness, blurred vision, memory problems, and headaches. Shamieh stated that these symptoms were consistent with a severe blow to the face. Shamieh continues to treat Mayne for his recurring headaches.

When the pain in his head and face began to subside, Mayne experienced neck pain. He returned to Shamieh, who ordered an MRI of Mayne's cervical spine. After reviewing the results of the MRI, Shamieh recommended that Mayne see Dr. Clark Gunderson, an orthopedic surgeon, for further treatment.

Gunderson examined Mayne and concluded that Mayne suffered from significant symptomatic cervical herniations. Gunderson recommended that Mayne undergo a two-level anterior discectomy and fusion with anterior plate fixation and use of an external bone graft stimulator. Gunderson noted that an MRI taken before the accident showed some disc protrusion, but, considering the different symptoms, he stated that he felt within reasonable medical probability that the fishing accident caused the cervical symptoms and Mayne's resulting disability.

One year after the incident, Mayne went to a plastic surgeon, Dr. Darrell Henderson, for issues related to his headaches and breathing problems. Henderson noted that Mayne suffered from severe lacerations on his nose and eyelids and deviations of his septum. Henderson concluded that Mayne required surgery to address the scarring and nasal fractures.

Mayne was also evaluated by Lawrence Dilks, Ph.D., a neuropsychologist, with regard to his closed head injury. After examining Mayne and reviewing his test results, Dilks concluded that the blow to Mayne's head had caused cognitive impairment. In addition, Dilks stated that Mayne suffered from depression,

secondary to his cognitive impairment, and pain disorder. It is undisputed that Mayne suffered from cognitive impairment before the accident as well.

Approximately a year and a half after Mayne was injured, Omega Protein retained a physician, Dr. Thomas Bertuccini, to evaluate Mayne's need for cervical surgery. After reviewing the medical records and examining Mayne, Bertuccini suggested that Mayne receive left epidural steroid injections rather than the surgery that Gunderson recommended. Bertuccini compared the tests conducted before Mayne's injury with the tests afterwards and found that there was no change between the two periods. Bertuccini recognized, however, that a trauma of the sort that Mayne underwent could play a part in causing a pre-existing condition to become symptomatic.

Immediately following the accident, Omega Protein began paying maintenance to Mayne at the rate of $20 per day. Omega Protein also paid for some of Mayne's medical bills. These payments were suspended three months after the accident. Omega Protein never resumed the payments.

Mayne filed suit against Omega Protein in district court, seeking damages due to the negligence of Omega Protein employees and the unseaworthiness of the F/V COTE BLANCHE BAY. Mayne also sought maintenance and cure, as well as attorney's fees for failure to pay these benefits in a timely fashion. After the pleadings were closed, Omega Protein filed a motion for judgment on the pleadings, arguing that Mayne failed to allege sufficient facts to support his claims of Jones Act negligence and unseaworthiness. The district court denied this motion. After a bench trial, the district court found that Mayne suffered damages due to the negligence of Omega Protein employees and the unseaworthiness of the vessel. The district court also found that Mayne was entitled to payment for maintenance and cure, as well as attorney's fees because of Omega Protein's willful denial of maintenance and cure. The district court granted Mayne $37,801 in past wage loss, $226,196 in future wage loss, $25,000

No. 09-30443

in past medical expenses, $75,000 in future medical expenses, $300,000 in past pain and suffering, $400,000 in future pain and suffering, maintenance of $35 per day from the date of the injury until the date of trial, $15,000 in attorney's fees, and pre- and post-judgment interest.  This appeal followed.

## II

Omega Protein raises a number of issues.  First, it argues that the district court erred when it denied the motion for judgment on the pleadings.  We review a district court's decision on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) de novo.[1]  Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  The standard for deciding a motion under Rule 12(c) is the same as that for deciding a motion under Rule 12(b)(6).[2] "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."[3]  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[4]

Omega Protein argues that its motion for judgment on the pleadings should have been granted because the pleadings did not place it on notice of any factual or legal basis for the Jones Act and unseaworthiness claims.  After a review of Mayne's complaint and the joint pretrial order, we conclude that the

---

[1] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[2] *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n.8 (5th Cir. 2002).

[3] *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (internal quotation marks omitted).

[4] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

pleadings provide ample description of Mayne's claim for relief and the grounds on which it rests. Mayne alleged that Captain Schools was negligent in continuing to draw in the net when the ring was caught and that the vessel was unseaworthy because it allowed the ring to catch. These fact-specific allegations were sufficient to notify Omega Protein of the grounds for Mayne's complaint. Therefore, the district court did not err when it denied Omega Protein's motion for judgment on the pleadings.

## III

Next, Omega Protein argues that Mayne did not present sufficient evidence to prove that his accident was the result of the vessel's unseaworthiness or Omega Protein's negligence under the Jones Act. In reviewing a bench trial, we review findings of fact for clear error and conclusions of law de novo.[5] A trial court's findings with respect to negligence and proximate cause are findings of fact.[6] "A factual finding is not clearly erroneous as long as it is plausible in the light of the record read as a whole."[7]

An unseaworthiness claim is "predicated without regard to fault or the use of due care. A shipowner has an absolute nondelegable duty to provide a seaworthy vessel."[8] "To establish a claim of unseaworthiness, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used."[9] This standard does not require that the vessel and equipment

---

[5] *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009).

[6] *Id.*

[7] *United States v. Cluck*, 143 F.3d 174, 180 (5th Cir. 1998).

[8] *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991) (internal quotation marks omitted).

[9] *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (internal quotation marks omitted).

be perfect, but rather that they be reasonably suited for their purposes.[10] In addition, the plaintiff must establish that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[11]

On appeal, Omega Protein argues that the district court erred when it found that the purse boat was not fit for its intended purpose. According to Omega Protein, there was no testimony to establish that the purse boat was unreasonably dangerous. Omega Protein's assertions of error are unconvincing. Contrary to Omega Protein's statements, there was testimony that it was reasonably foreseeable that a ring could become caught between the step and the thwart. Omega Protein did not implement safety procedures to protect its employees from such an incident. There was also no evidence that the gap served any purpose or that closing the gap was unfeasible or would impair the function of the vessel. The district court could plausibly conclude from this evidence that the purse boat was not reasonably fit for its intended purpose. Imposing liability here is not equivalent to requiring an accident-free ship. A shipowner must provide a vessel that is reasonably fit and safe for the purposes for which it is to be used.[12] Here, Omega Protein did not do so.

Because we hold that the district court did not err in finding that the vessel was unseaworthy, we need not address the issue of Jones Act negligence. The finding of unseaworthiness is sufficient to support Mayne's award for wage loss, medical expenses, pain and suffering, and pre- and post-judgment

---

[10] *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992).

[11] *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988).

[12] *Boudreaux*, 280 F.3d at 468.

No. 09-30443

interest.[13]   Both sides agreed in oral argument that if the unseaworthiness finding were upheld, it would be unnecessary to reach the negligence issue since all amounts awarded by the district court would be the same even in the absence of a finding of Jones Act negligence.

## IV

Omega Protein argues that Mayne did not provide sufficient evidence to prove that his cognitive impairment and cervical condition were caused by the accident.  Questions of causation are treated as fact questions, which we review for clear error.[14]   In this case, we find no clear error on the part of the district court when it found that the accident caused Mayne's cognitive impairment and cervical condition.  On both issues, there was expert testimony sufficient to support a finding that the accident caused the condition or worsening of the condition in question.

## V

Omega Protein contends that the district court erred when it found that Omega Protein was arbitrary and capricious in the payment of maintenance and cure and when it awarded attorney's fees. We review a district court's conclusion that a seaman was entitled to an award of attorney's fees for the willful failure of his employer to pay maintenance and cure for abuse of discretion.[15] We review the factual findings underlying this conclusion for clear error.[16]

A shipowner must pay maintenance and cure to a seaman who is injured while in the service of his ship, regardless of whether the shipowner was at fault

---

[13] *See* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-15 (4th ed. 2004); *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 214-15 (5th Cir. 2006).

[14] *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009); *Gavagan v. United States*, 955 F.2d 1016, 1019 (5th Cir. 1992).

[15] *Breese v. AWI, Inc.*, 823 F.2d 100, 102-03 (5th Cir. 1987).

[16] *Id.* at 103.

No. 09-30443

or the ship unseaworthy.[17]    The obligation to pay maintenance and cure "includes paying a subsistence allowance, reimbursing medical expenses actually incurred, and taking all reasonable steps to ensure that the seaman receives proper care and treatment."[18]   If a shipowner is arbitrary and capricious in failing to pay maintenance and cure, he is liable for attorney's fees.[19]

Omega Protein argues that it did not act arbitrarily or capriciously in terminating maintenance and cure payments to Mayne because Mayne did not provide it with documentation of any continuing medical treatment. This argument is unavailing because the record establishes that Omega Protein had contact with Mayne's physicians and yet still failed to investigate the claims or make payments beyond the first three months following Mayne's injury. Therefore, the district court's findings are not clearly erroneous, and its award of attorney's fees was not an abuse of discretion.

## VI

Omega Protein asserts that the district court erred when it ordered a retroactive increase in the rate of maintenance from $20 per day to $35 per day. Omega Protein argues that, because Mayne never pled that the rate of maintenance was insufficient, any such claim was waived. However, Mayne's complaint did not limit the court to awarding only a reinstatement of maintenance payments. Maintenance and cure entitles a seaman to "the reasonable cost of food and lodging, provided he has incurred the expense."[20]  A claim for maintenance, then, includes a claim for the correct rate of

---

[17] *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987).

[18] *Id.*

[19] *Id.*

[20] *Hall v. Noble Drilling (U.S.) Inc.*, 242 F.3d 582, 587 (5th Cir. 2001).

No. 09-30443

maintenance. Therefore, the district court did not err in ordering a retroactive increase in the rate of maintenance.

## VII

Finally, Omega Protein argues that the district court erred when it determined its award of past and future lost wages. A trial judge's assessment of damages is a finding of fact that we review for clear error.[21] A damage award will be considered "excessive if it is greater than the maximum amount a trier of fact could properly have awarded."[22]

The aim of a court awarding damages for lost future earnings is to "provide the victim with a sum of money that will, in fact, replace the money that he would have earned."[23] In order to do so, this court has used a four-step approach.[24] The court must "estimat[e] the loss of work life resulting from the injury or death, calculat[e] the lost income stream, comput[e] the total damage, and discount[] that amount to its present value."[25] "[C]alculation of the lost income stream begins with the gross earnings of the injured party at the time of injury."[26] In previous cases, we have calculated "gross earnings" by analyzing the earnings from past years when earnings data was inconsistent.[27] A court

---

[21] *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988).

[22] *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1035 (5th Cir. 1984).

[23] *Culver v. Slater Boat Co.*, 722 F.2d 114, 120 (Former 5th Cir. 1983) (en banc).

[24] *Id.* at 117.

[25] *Id.*

[26] *Id.*

[27] *See Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1050 (5th Cir. 1990) (relying on plaintiff's earnings record over the previous two years); *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587-88 (5th Cir. 1988) (relying on plaintiff's earnings from the past 3.82 years to calculate future-earnings loss).

must recognize, however, that "[a]rriving at a reasonable estimate of anyone's financial future involves estimates of a whole spectrum of factors."[28] "[W]e must remember that the ultimate total damage figure awarded is the sum of a series of predictions, none of which involves mathematical certainty, and that it is the reasonableness of the ultimate figure that is really in issue . . . ."[29]

Omega Protein argues that the district court erred when it relied on the calculations of Mayne's economic expert, Dr. Randy Rice.  We agree.  Rice's calculations were based on the assumption that Mayne's annualized earnings at the time of injury were $25,000 per year.  No evidence supports this assumption.  The number was given to Rice by Mayne's attorney.  Mayne's tax returns show that he never earned more than $22,000 in the previous five years.  Despite repeated questioning from Mayne's attorney, Rice declined to state that the amount of $25,000 was a reasonable number.  According to Rice, "I didn't make that call. [The number] was given to me by [Mayne's attorney]."  There is no other testimony or evidence that Mayne's earning capacity was or would become $25,000 per year.  "[A]n award for damages cannot stand when the evidence to support it is speculative or purely conjectural."[30]  Because the district court based its lost wages award on an assumption about Mayne's income that has insufficient evidentiary support, we vacate the damages award and remand for further proceedings.

*        *        *

For the reasons stated, the judgment is AFFIRMED in part, but VACATED as to Mayne's damages award.  We REMAND for further proceedings.

---

[28] *Culver*, 722 F.2d at 120.

[29] *Id.* at 121 (internal quotation marks omitted).

[30] *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991).

11