# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 25, 2012

Lyle W. Cayce
Clerk

No. 11-30518

RAMIRO MARTINEZ,

Plaintiff–Appellee

v.

OFFSHORE SPECIALTY FABRICATORS, INCORPORATED,

Defendant–Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:08-CV-4224

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:[*]

Plaintiff–Appellee Ramiro Martinez, a seaman employed by Defendant–Appellant Offshore Specialty Fabricators, Inc. ("Offshore") and permanently assigned to its vessel the D/B WILLIAM KALLOP, was injured while working aboard the M/V MR. GILBERT, another vessel owned by Offshore. Martinez sued Offshore, asserting claims of Jones Act negligence and unseaworthiness. Following a bench trial, the district court entered judgment

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-30518

in favor of Martinez, and Offshore appealed. For the reasons stated below, we AFFIRM.

## I. BACKGROUND

Martinez began working as a mechanic for Offshore in March 2007. In May 2008, Martinez was working as a crew member on the derrick barge WILLIAM KALLOP, a vessel owned and operated by Offshore. On May 26, 2008, while working aboard the WILLIAM KALLOP, Martinez and his supervisor, Thomas Smith, were instructed to go aboard the MR. GILBERT—a tug also owned and operated by Offshore that was providing support to the WILLIAM KALLOP—in order to repair a defective winch. This was the first time Martinez had ever been aboard the MR. GILBERT. Upon inspecting the winch, Smith saw that a pin was out of alignment and badly rusted. Smith came up with the following process to remove the rust from the pin and reposition it correctly: they would heat the pin with a welding torch, "shock" it with water, and use a sledgehammer to beat away the rust and force the pin back into place.[1] They repeated the steps in this process for nearly an hour, with the job of swinging the sledgehammer alternating between Smith and Martinez. At trial, both Martinez and Smith testified that the area in which they had to work was cramped, requiring them to bend over while swinging the sledgehammer.

After about an hour of work, Martinez "felt something pop in [his] neck." Smith saw Martinez "twitch" and asked him whether something was wrong, to which Martinez replied that there was something wrong with his neck. Smith told Martinez to stop working. The job was eventually finished using a hydraulic jack.

---

[1] Offshore company policy required that workers complete a Job Safety Analysis before embarking on tasks in order to ensure that potential hazards were identified and safe procedures were decided upon. On this occasion, Martinez, Smith, and the other seamen they were working with signed a blank Job Safety Analysis without filling it out; Smith went back after the task was completed and filled in the substance of the form.

No. 11-30518

Shortly after his injury, Martinez visited Doug Mauro, a medic aboard the WILLIAM KALLOP, and asked for Bengay or a similar product because he had soreness in his arm after using a hammer. On May 28, Martinez visited Ray Pesson, another medic aboard the WILLIAM KALLOP. Martinez stated that he could not "move his head or jaw without shooting pain in the neck and shoulder."

On May 30, Martinez was interviewed by Pierre Gautreaux, a claims adjuster hired by Offshore. The following is a portion of that interview:

Q:  Were you in a restricted area where you had to swing?
A:  I had, well I had plenty of room, yeah.
Q:  Okay, okay. Um . . .
A:  It was about . . . five foot, in between the, the uh, the bulwark, and the winch.
Q:  Okay. So you had enough room to swing the hammer?
A:  I had enough room, yeah, so I was . . .
Q:  Okay. And you were swinging your left hand mainly?
A:  Left hand. I'm a left hander.
Q:  You're left handed, right.
A:  Yes.
Q:  Um, was there any trash or clutter in the area where you were standing that was making it difficult for you to get, you know, a good aim, or . . . ?
A:  No, well only, they only had the welding tables and a bunch of wrenches there that, I mean, tools.

During Martinez's deposition, the following relevant exchanges occurred:

Q:  So what do you think caused your neck to pop?
A:  The hammering with the pipe . . .
Q:  So you're saying using a hammer with a pipe caused your injury?
A:  Yes.

***

Q:  Did anything else play any part in your accident other than using this steel-handled hammer and trying to drive through the pin?

A:  No.

3

No. 11-30518

Martinez visited a neurosurgeon and two orthopedic surgeons.  He was diagnosed with cervical radiculopathy, cervical strain, and degenerative disc disease, and several doctors concluded that his condition was caused by the May 26 injury.  Dr. John Masciale, an orthopedic surgeon, concluded that Martinez would have "permanent restrictions on repetitive bending, stooping, lifting, and carrying," but that he would be "able to undertake light-to-medium work." Nathaniel Fentress performed a vocational rehabilitation evaluation of Martinez and concluded that Martinez's "current prognosis to successfully reenter and maintain significant gainful employment in his usual occupation as a mechanic or his prior occupations as a deckhand" was "poor."  Fentress opined that Martinez could possibly return to entry-level service economy employment, such as a security guard, small engine mechanic, or light duty delivery driver.  At the time of the bench trial, Martinez had not worked since the injury.

In 2007, the last year before Martinez's accident, he earned $48,315 working for Offshore.  His annual income in the five years preceding 2007 was: $8,009 in 2006; $3,681 in 2005; $2,803 in 2004; $6,200 in 2003; and $7,675 in 2002.

Martinez filed suit against Offshore under the Jones Act, 46 U.S.C. § 30104, and the general maritime law of the United States.  The case was tried without a jury on May 14, 2011 before Judge Eldon Fallon of the United States District Court for the Eastern District of Louisiana, who later entered findings of fact and conclusions of law.  *Martinez v. Offshore Specialty Fabricators, Inc.*, No. 2:08-CV-4224, 2011 WL 1527096 (E.D. La. Apr. 20, 2011.)  The court concluded that Offshore was negligent, that its negligence contributed to Martinez's injury, that the MR. GILBERT was unseaworthy, and that the unseaworthiness played a substantial part in causing Martinez's injury; it therefore found that Martinez was entitled to recover damages for past and future lost wages and past and future pain and suffering.  *Id*. at *6–8.  The court

4

No. 11-30518

also concluded that Martinez was contributorily negligent and accordingly reduced his recovery by 20%. *Id.* at *7–8. Offshore timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1333. This court has jurisdiction under 28 U.S.C. § 1291. When reviewing the district court's judgment following a bench trial, findings of fact are reviewed for clear error and legal issues are reviewed de novo. *Becker v. Tidewater*, 586 F.3d 358, 365 (5th Cir. 2009).

## III. DISCUSSION

### A. Negligence

A Jones Act employer is required to exercise "ordinary prudence under the circumstances," *Gautreax v. Surlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (en banc), to maintain a "reasonably safe work environment," *Ober v. Penrod Drilling Co.*, 726 F.2d 1035, 1037 (5th Cir. 1984) (per curiam). In order to prevail in a claim for negligence, the plaintiff must present some evidence from which the fact finder can infer that an unsafe condition existed and that the vessel owner either knew, or in the exercise of due care should have known, of the condition. *Perry v. Morgan Guar. Trust Co. of N.Y.*, 528 F.2d 1378, 1379 (5th Cir. 1976). Under the Jones Act, "an employer is liable for the negligence of his employees." *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991). "If the defendant's negligence played any part, however small, in producing the seaman's injury, it results in liability." *Id.*

"In a bench tried admiralty case, a district court's findings concerning negligence and causation are findings of fact reviewable by this court only for clear error." *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 303 (5th Cir. 2008). A finding is clearly erroneous when "the appellate court, viewing the evidence in its entirety, is left with the definite and firm conviction that a mistake has been made." *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 376

(5th Cir. 2012) (internal quotation mark omitted).  Where the district court's finding is plausible in light of the record as a whole, it is not clearly erroneous, even if the appellate court would have weighed the evidence differently.  *Id.* Findings of fact based on the credibility of witness testimony are accorded "even greater deference."  *Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV*, 235 F.3d 963, 970 (5th Cir. 2001).

The district court found that "Offshore was negligent in requiring [Martinez] to swing a sledgehammer in cramped conditions that required him to crouch and bend forward in a manner that increased the risk of injury to his neck and upper torso," and that "a reasonable alternative tool, the hydraulic jack, was available and was in fact used to complete the task."  *Martinez*, 2011 WL 1527096, at *6.  In finding that this situation amounted to negligence, the court relied upon *Crador v. Louisiana Department of Highways*, 625 F.2d 1227 (5th Cir. 1980), which held that evidence that a seaman had to work in "poorly lighted, awkward and confined quarters without adequate help and without suitable tools and equipment" was sufficient to support a jury verdict of negligence.  *Id.* at 1230.

Offshore first argues that the district court clearly erred in finding that Martinez's workspace was restricted.  Offshore argues that this finding was clearly erroneous in light of evidence that Martinez failed to mention a cramped workspace during his deposition and that he told Offshore's claims adjuster that he had "plenty of room" in which to work.

In response, Martinez highlights the evidence that supports the district court's finding that the workspace was cramped.  Smith testified that the workspace was "so tight, it's just like you had a ledge over, you couldn't stand up. . . . [W]e all had to lean over and get good solid licks on it. . . . [Y]ou might have had two, no more than two feet of working room at most in that area." Martinez testified that a work table was in the area that prevented him from

swinging the sledgehammer normally, and demonstrated his swinging position for the court by bending his torso over. Offshore argues that Martinez and Smith were incredible witnesses, while Martinez notes that Offshore failed to call any witnesses at trial to rebut the testimony of Martinez and Smith that the work space was insufficient.

In light of the record evidence, we conclude that the district court did not clearly err in finding that the workspace was cramped. This finding is supported by the testimony of Smith and Martinez; while Offshore challenges their credibility, the district court was in a far better position to assess their credibility than are we. Although the testimony about a cramped workspace is contradicted by Martinez's statement to the claims adjuster that he had plenty of room in which to work, the court could reasonably credit the fully developed trial testimony that it was able to witness over the transcript of an interview with an Offshore claims adjuster.

Nor did the district court clearly err in finding that Offshore was negligent. The evidence upon which the district court relied to make this factual finding—that Martinez was required to swing a sledgehammer while bent over because of space restrictions, despite the availability of alternative equipment—is sufficient to make the finding plausible in light of the record as a whole. We are not left with the firm conviction that a mistake has been made.

Offshore also argues that the finding of negligence was in error because no evidence was introduced that Offshore knew or should have known of the unsafe working conditions.[2] As noted above, the negligence of an employee is

---

[2] Offshore makes this argument in a single sentence of its briefing on the issue of negligence. Offshore fails to cite any authority in support of this point or to elaborate upon it with any argument. "A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it." *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010). Even if we were to treat this argument as properly presented, it is without merit, as discussed below.

imputed to a Jones Act employer, *see Brister*, 946 F.2d at 354, and there was sufficient evidence presented to support a finding that Smith, Martinez's supervisor, knew or should have known that the work Martinez was engaged in was unsafe. Smith saw the rusted condition of the pin and came up with the procedure for removing the rust. Smith also testified about the cramped space in which they had to work and the fact that they had to bend over in order to swing the sledgehammer. In addition, the evidence showed that the Job Safety Analysis that was supposed to be completed before a project was undertaken was not completed until after this job was finished, and Smith should have known that the failure to complete this analysis would increase the risk that an employee would be injured by working in an unsafe fashion.[3]

For the foregoing reasons, we conclude that the district court did not err in finding that Offshore was negligent and that its negligence caused Martinez's injury. Because the finding of negligence is sufficient to support the judgment in favor of Martinez, we need not consider the alternative basis of unseaworthiness also relied upon by the district court. *See Jemison v. Falcon Drilling Co., Inc.*, 140 F.3d 1038, at *6 n.6 (5th Cir. 1998) (per curiam) (unpublished); *Guevara v. Mar. Overseas Corp.*, 34 F.3d 1279, 1282 (5th Cir. 1994) (per curiam).

## B. Contributory Negligence

A seaman is also "obligated under the Jones Act to act with ordinary prudence under the circumstances," which circumstances take account of the seaman's "experience, training, [and] education." *Gautreaux*, 107 F.3d at 339. As is the case for causation with respect to employers, the causation standard for the negligence of seamen is slight: "To establish causation, an employer must show that a seaman's negligence played any part, even the slightest, in

---

[3] The final component of a Jones Act negligence claim, causation, has not been challenged by Offshore on appeal.

producing the injury." *Johnson*, 544 F.3d at 302 (internal quotation marks omitted). While a seaman's contributory negligence will not bar recovery under the Jones Act, *Gavagan v. United States*, 955 F.2d 1016, 1019 (5th Cir. 1992), it is an affirmative defense that will diminish recovery in proportion to the seaman's fault, *Johnson*, 544 F.3d at 302. Findings of contributory negligence and allocations of fault are factual findings reviewed for clear error. *Motts v. M/V GREEN WAVE*, 210 F.3d 565, 569 (5th Cir. 2000).

The district court found that "[i]n light of [Martinez's] extensive experience working aboard boats and as a mechanic, [he] knew or should have known that using a sledgehammer in cramped conditions such as those aboard the M/V MR. GILBERT could increase the risk of injury." *Martinez*, 2011 WL 1527096, at \*8. It also found that Martinez "knew or should have known that Offshore had a 'work-stop' program through which [he] could have immediately stopped work on the frozen winch pin until a safer method could be determined." *Id.* Based on these findings, the district court found that Martinez was 20% at fault for his injury. *Id.*

Offshore argues that the district court erred in finding that Martinez was only 20% at fault for his injury. None of the cases cited by Offshore in support of this argument establishes that the district court's finding of fault was clear error. Because Offshore has failed to present authority or argument that shows the district court's determination of relative fault was clearly erroneous, we uphold its contributory negligence finding.

## C. Lost Wages

The final issue that Offshore raises on appeal relates to the lost wages awarded to Martinez by the district court. Offshore argues that the award was unsupported by the evidence and that the district court used a clearly erroneous income basis for its calculation of the award.

*1. Factual Basis for Future Lost Wages*

First, Offshore argues that there was no factual basis for concluding that Martinez would be unable to return to his prior work as a mechanic. Offshore relies on the deposition testimony of Dr. John Masciale, an orthopedic surgeon who treated Martinez. Dr. Masciale stated that even after Martinez reached maximum medical recovery, which he anticipated would occur in July 2011, he would recommend that Martinez avoid "repetitive bending and stooping, repetitive lifting and carrying, awkward postures of the neck, and very heavy lifting and carrying," and that he avoid "lifting and carrying beyond an occasional basis of more than 40 or 50 pounds at a maximum." When asked by Offshore's counsel how he would translate those restrictions into Department of Labor classifications for light, medium, or heavy labor, Dr. Masciale responded, "It would likely fall on the range between light to medium work, but certainly not heavy or very heavy work." Offshore then relies on the Vocational Rehabilitation Evaluation completed by Nathaniel Fentress, in which Fentress stated that the job Martinez was performing for Offshore at the time of his injury was "maintenance mechanic," classified by the Department of Labor as "medium" labor. Offshore points out that the Department of Labor classifies "medium" work as involving the following strength requirements: "Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects." Based on Fentress's report and the strength requirement description for medium labor jobs, Offshore argues that (1) the job Martinez was doing at the time of his injury was medium labor work, which is in the "range" that Dr. Masciale said Martinez could return to, and (2) the requirements of a medium labor job do not exceed those restrictions that Dr. Masciale placed upon Martinez. For this reason, Offshore argues that Martinez could return to his

No. 11-30518

former job as a mechanic and that an award for future lost wages is unwarranted.

Martinez argues in response that Dr. Masciale opined that Martinez could work *in the range* between light to medium work, not that Martinez could perform any and all jobs in the medium-work range. Martinez also argues that the range approved by Dr. Masciale is qualified by the specific physical restrictions he imposed (i.e., no repetitive bending, stooping, etc.), so that the universe of medium-labor jobs that Martinez can do is narrowed to a smaller group involving no repetitive bending, stooping, and so forth. Martinez points out that Fentress's report describes the physical demands of a maintenance mechanic job as follows: "stooping, kneeling, crouching, frequent reaching and handling with the upper extremities bilaterally and in all directions and standing upwards to and in excess of two-thirds of the work day." Martinez argues that this job description could very well encompass the repetitive bending, stooping, lifting, carrying, and awkward neck postures in which Martinez can no longer engage. Martinez also notes that Fentress's report stated that Martinez's prognosis for returning to his usual occupation as a mechanic was "poor" and that after a full recovery Martinez "may be able to pursue some entry level service economy jobs." For all of these reasons, Martinez argues that the district court's finding that he cannot return to his job as a mechanic was not clearly erroneous.

We conclude that Martinez has the better of this argument. The description of a mechanic's job provided by Fentress ("stooping, kneeling, crouching, frequent reaching and handling with upper extremities . . .") is such that the job could easily exceed the physical restrictions placed upon Martinez, which preclude him from doing almost all of those activities on a repetitive basis. In addition, the Department of Labor description of medium labor jobs states that such jobs may require exerting 10 to 25 pounds of force frequently and/or

less than 10 pounds of force "constantly" to move objects, which describes exactly the type of "repetitive lifting and carrying" from which Martinez is prohibited. Finally, Fentress's report provides a poor prognosis for Martinez to return to the workforce in general. For these reasons, we conclude that the district court did not clearly err in finding that Martinez was entitled to future lost wages.

*2. Calculation of Past and Future Lost Wages*

Offshore also argues that the district court improperly calculated the past and future lost wages due to Martinez. "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Culver v. Slater Boat Co.*, 722 F.2d 114, 120 (5th Cir. 1983) (en banc). "[A]n award for damages cannot stand when the evidence to support it is speculative or purely conjectural." *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991). The district court's assessment of damages is a finding of fact reviewed for clear error. *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 587 (5th Cir. 1988).

Offshore argues that the district court clearly erred in using the figure $48,315 as the annual income from which to calculate Martinez's lost wages. This figure is the amount that Martinez earned in 2007 from his work as an Offshore employee from March through the end of the year. Although this was Martinez's last full year of earnings history before his injury, Offshore argues that this amount should not have been used because it is much higher than Martinez's earnings in prior years. Offshore argues that Martinez's average annual income for the 40 years preceding his injury was $8,400 and that his average annual income for the five years preceding his injury was $5,673.60. Offshore thus argues that the district court "should have based any award for past or future lost wages on a three year, five year or other average of the plaintiff's historical earnings."

No. 11-30518

Calculation of lost income "begins with the gross earnings of the injured party *at the time of the injury*," to which amounts such as fringe benefits should be added and taxes and work expenses should be deducted. *Culver*, 722 F.2d at 117 (emphasis added). Offshore argues that we should vary the calculation method in *Culver* by beginning with an average of Martinez's earnings over several years, but the cases it cites in support of its argument do not provide authority for calculating lost wages in this manner.

In *Hernandez v. M/V RAJAAN*, this court held that the district court clearly erred in using "the average full-time United States longshoreman's rate of $23,000.00 per annum" to calculate lost wages, when the plaintiff had never earned anything near this "average" rate—his earnings in the four years preceding his accident were $8,341; $8,634; $6,500; and $2,600. 841 F.2d at 587. The court noted these figures not to calculate their average, but to show the lack of any evidence supporting the figure used by the district court and to show also how far that figure was from amounts that were supported by evidence. The court held that the plaintiff could accept an amount calculated by the defendant (which was the result of averaging the actual annual income amounts listed above) or opt for a new trial on damages. *Id.* at 588. Thus, *Hernandez* supports the proposition that awards for lost wages cannot be based on speculation or conjecture, but it does not support the proposition that wages should be averaged over several years to determine the baseline from which to calculate lost wages.

*Herbert v. Wal-Mart Stores*, 911 F.2d 1044 (5th Cir. 1990) (per curiam), also cited by Offshore, is even less helpful to Offshore's argument. In that case, the evidence presented of Herbert's annual income was as follows: in 1982 he earned $31,897; in 1984 he earned $27,633; in 1987 he earned $1,928; and in 1988, the year of his injury, he earned $5,918 (no evidence was presented of his earnings for the missing years). *Id.* at 1050. In calculating Herbert's lost wages, the district court used his annual income the year of his injury, $5,918. *Id.* This

court affirmed, noting that although the damages awarded were "low, they were by no means clearly erroneous." *Id.* at 1049–50. The court never suggested that it was unreasonable to use only the most recent year of Herbert's earnings, despite the large difference between that amount and the amount he earned only a few years earlier.

Offshore has thus presented no authority or argument that persuades us to deviate from *Culver*'s instruction that lost wages should be calculated based upon the plaintiff's gross earnings at the time of his injury. The district court's calculation of damages was supported by evidence in the record and was not clearly erroneous.

## IV. CONCLUSION

The district court did not clearly err in finding that Offshore was negligent. Nor did it clearly err in calculating the respective fault of the parties, in determining that Martinez was entitled to future lost wages, or in calculating the award for lost wages. For these reasons, the judgment of the district court is AFFIRMED.